IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEIZURE OF 0.13995132 BITCOIN (BTC) STORED IN OR ACCESSIBLE AT KRAKEN ASSOCIATED WITH THE INVESTIGATION OF A CRYTO-ENABLED IMPERSONATION SCAM BY THE HAMPTON, NH POLICE DEPARTMENT | Case No. 26-mj-43-01-AJ |

**<u>AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT</u>**

I, Special Agent Nathanael Gamble, being duly sworn, depose and state as follows:

**<u>INTRODUCTION AND AGENT BACKGROUND</u>**

1.    I am a Special Agent with United States Secret Service (USSS) and have been employed so since December 16, 2024. I am currently assigned to the USSS Manchester Resident Office in Manchester, New Hampshire.  While employed by the USSS, I have investigated federal criminal violations related to, among other things, financial fraud investigations, including the use of cryptocurrency to facilitate these crimes.  In my role with the USSS, I completed a 12-week Criminal Investigator Training Program at the Federal Law Enforcement Training Centers (FLETC) in Glynco, Georgia and a one-week Cyber Foundational Training course with the USSS National Computer Forensics Institute in Hoover, Alabama. In addition, I have completed a 22-week USSS Special Agent Training Course (SATC) at the James J. Rowley Training Center in Beltsville, Maryland.

2.    As a USSS Special Agent, I have received training and experience on how people use computers to commit crimes and the law enforcement techniques that can be utilized to investigate and disrupt such activity. I have also been involved in, among other things, multiple complex financial investigations involving the victimization of individuals and entities by frauds and swindles perpetrated by subjects over the Internet. Often in these investigations, victim

proceeds of these frauds are laundered or transferred through cryptocurrency. Additionally, I have received training in conducting cryptocurrency investigations, blockchain analysis, and use of blockchain analysis tools such as TRM and Chainalysis.

3.      The statements contained in this affidavit are based in part upon my experience, my knowledge of the facts and circumstances surrounding this investigation, and on information provided to me by other law enforcement personnel and other witnesses.  This affidavit is intended to show only there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**PURPOSE OF AFFIDAVIT**

4.      This affidavit is submitted in support of an application for a combined criminal and civil seizure warrant for the following SUBJECT ASSETS:

> 0.13995132 Bitcoin (BTC) stored in or accessible at Payward Interactive, Inc. (d.b.a. Kraken), in user account ID AA14 N84G BTOB VODI, registered to Silviu-Valentin Miroslav of Romania, with a user ID of *silviusbz*.

5.      The SUBJECT ASSETS, and the manner in which the seizure is to be conducted, are further described in Attachments A and B, which are incorporated herein by reference.

6.      As set forth below, I submit there is probable cause to believe that the SUBJECT ASSETS are subject to forfeiture to the United States:

   a.   pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1) because they are property involved in a money laundering transaction or attempted transaction in violation of 18 U.S.C. § 1956 and/or 18 U.S.C. § 1957, or are property traceable to such property;

   b.   pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) because they are property constituting, or derived from, proceeds traceable to one or more wire

fraud offenses in violation of 18 U.S.C. § 1343 and/or a wire fraud conspiracy in

violation of 18 U.S.C. § 1349; and

     c.    pursuant to 18 U.S.C. § 982(a)(2)(A) as property constituting, or derived from

          proceeds obtained, directly or indirectly, as the result of a violation of 18 U.S.C. §

          1343, or a conspiracy to violate 18 U.S.C. § 1349, affecting a financial institution.

     7.    Money laundering, attempted money laundering, and conspiracy to commit

money laundering in violation of 18 U.S.C. §§ 1956 or 1957, wire fraud in violation of 18 U.S.C.

§ 1343, and conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 are hereinafter

collectively referred to as the SUBJECT OFFENSES.

## LEGAL AUTHORITY FOR SEIZURE AND FORFEITURE

     8.    As to civil forfeiture, under 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or

personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956 or

18 U.S.C. § 1957], or any property traceable to such property" is subject to forfeiture to the

United States.[1]

---

[1]    It is a violation of 18 U.S.C. § 1956(a)(1)(B)(i) to, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conduct[] or attempt[] to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—knowing that the transaction is designed in whole or in part—to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]"

It is a violation of 18 U.S.C. § 1957(a), in the circumstances set forth in 18 U.S.C. § 1957(d), to knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 derived from specified unlawful activity.

Pursuant to 18 U.S.C. § 1957(f)(1), a monetary transaction includes "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution . . . ."

Pursuant to 18 U.S.C. § 1956(c)(6)(A), a financial institution includes any financial institution as defined in 31 U.S.C. § 5312(a)(2) or regulations promulgated thereunder. Pursuant to 31 U.S.C. § 5312(a)(2)(J), a financial institution includes "a currency exchange, or a business engaged in the exchange of currency, funds, or value that substitutes for currency or funds[.]"

9.      Additionally, under 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting a 'specified unlawful activity' (as defined in [18 U.S.C. § 1956(c)(7)]), or a conspiracy to commit such offense" is subject to forfeiture to the United States. Pursuant to 18 U.S.C. § 1956(c)(7)(A)— incorporating any act or activity constituting an offense listed in 18 U.S.C. § 1961(1) (except an act which is indictable under Title 31, Chapter 53, Subchapter II)—any act which is indictable under 18 U.S.C. § 1343 or 18 U.S.C. § 1956 constitutes a "specified unlawful activity."

10.     As property subject to civil forfeiture under 18 U.S.C. § 981(a), the SUBJECT ASSETS may be seized pursuant to 18 U.S.C. § 981(b).

11.     As to criminal forfeiture, under 18 U.S.C. § 982(a)(1), "[t]he court, in imposing sentence on a person convicted of an offense in violation of [18 U.S.C. § 1956 or 18 U.S.C. § 1957] shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."

12.     Additionally, under 18 U.S.C. § 982(a)(2)(A), "[t]he court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate . . . [18 U.S.C. § 1343], affecting a financial institution . . . shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation."

13.     Additionally, under 18 U.S.C. § 981(a)(1)(C), applicable pursuant to 28 U.S.C. § 2461(c), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting a 'specified unlawful activity' (as defined in [18 U.S.C. § 1956(c)(7)]), or a conspiracy to commit such offense" is subject to forfeiture. Pursuant to 18

U.S.C. § 1956(c)(7)(A)— incorporating any act or activity constituting an offense listed in 18

U.S.C. § 1961(1) (except an act which is indictable under Title 31, Chapter 53, Subchapter II)—

any act which is indictable under 18 U.S.C. § 1343 constitutes a "specified unlawful activity."

14.    As property subject to criminal forfeiture under 18 U.S.C. § 982(a)(1), 18 U.S.C.

§ 982(a)(2)(A), and 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the SUBJECT ASSETS

may be seized pursuant to 21 U.S.C. § 853(f), as incorporated by 18 U.S.C. § 982(b)(1) and 28

U.S.C. § 2461(c).

15.    With respect to seizure, 21 U.S.C. § 853(f) provides that a court may issue a

criminal seizure warrant when it "determines that there is probable cause to believe that the

property to be seized would, in the event of conviction, be subject to forfeiture and that an order

under [21 U.S.C. § 853(e)] may not be sufficient to assure the availability of the property for

forfeiture . . . ."

16.    The Court should conclude that a restraining order under Section 853(e) would be

inadequate, because the SUBJECT ASSETS are currently in the custody of Kraken, and Kraken

requires a warrant to turn over the assets to law enforcement so that their value can be preserved

for potential return to victims.

17.    As to civil forfeiture, as relevant here, the government's seizure of any property

(other than real property and interests in real property, as addressed in 18 U.S.C. § 985) must be

pursuant to a warrant "obtained in the same manner as provided for a search warrant under the

Federal Rules of Criminal Procedure" unless certain exceptions apply. 18 U.S.C. § 981(b)(1),

(2).

18.    Pursuant to 18 U.S.C. § 981(b)(3), "[n]ot withstanding the provisions of rule 41(a)

of the Federal Rules of Criminal Procedure, a seizure warrant may be issued pursuant to this

subsection by a judicial officer in any district in which a forfeiture action against the property

may be filed under [28 U.S.C. § 1355(b)], and may be executed in any district in which the

property is found, or transmitted to the central authority of any foreign state for service in

accordance with any treaty or other international agreement."

19.     Venue for a forfeiture action is proper in this district pursuant to 28 U.S.C. §

1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in the District of

New Hampshire.  Further, venue is proper in this district pursuant to 28 U.S.C. §§ 1355(b)(1)(B),

1395(a), which permit a civil proceeding for forfeiture to "be prosecuted in the district where it

accrues or the defendant is found."

20.     Pursuant to 28 U.S.C. § 1355(b)(2), "[w]henever property subject to forfeiture

under the laws of the United States is located in a foreign country, or has been detained or seized

pursuant to legal process or competent authority of a foreign government, an action or

proceeding for forfeiture may be brought as provide in paragraph (1), or in the United States

District Court for the District of Columbia."

21.     For the reasons listed above, the United States seeks a combined criminal and

civil seizure warrant authorizing law enforcement to seize the SUBJECT ASSETS and preserve

them pending further forfeiture proceedings.

## BACKGROUND ON CRYPTOCURRENCY

22.     Based on my training, research, education, and experience, I am familiar with the

following relevant terms and definitions:

a.     Virtual currencies are digital representations of value that, like traditional

coin and paper currency, function as a medium of exchange (i.e., they can be digitally

traded or transferred and can be used for payment or investment purposes). Virtual

currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin and Ether (ETH), are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

b.    Cryptocurrency, a type of virtual currency, is a decentralized, peer-to-peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.[2]  Examples of cryptocurrency are Bitcoin, Litecoin, and Ether. Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers.  Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object. Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries.  Generally, cryptocurrency is not issued by

---

[2] Fiat currency is currency issued and regulated by a government such as the U.S. Dollar, Euro, or Japanese Yen.

any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.[3] Cryptocurrency is not illegal in the United States.

        c.      Bitcoin (BTC) and Ethereum (ETH) are both types of cryptocurrency. Payments or transfers of value made with BTC or ETH are recorded in a blockchain network. Cryptocurrency can be stored in a virtual account called a digital wallet. Digital wallets are software programs and/or hardware devices that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address of key. To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key"). A public address is represented as a case-sensitive string of letters and numbers. For example, in the case of Bitcoin these addresses are 26-35 characters long with some addresses extending up to 74 characters. Each public address is controlled and/or accessed through the use of a unique corresponding private key, the cryptographic equivalent of a password or PIN needed to access the address. Only the holder of an address's private key can authorize any transfers of cryptocurrency from that

---

3 Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

address to another cryptocurrency address. A digital wallet will often manage these private and public keys for the user to allow for simplified transactions.

d.      A <u>blockchain</u> is a digital ledger run by a decentralized network of computers referred to as "nodes." Each node runs software that maintains an immutable and historical record of every transaction utilizing that blockchain's technology. Many digital assets, including virtual currencies, publicly record all of their transactions on a blockchain, including all of the known balances for each virtual currency address on the blockchain.[4] Blockchains consist of blocks of cryptographically signed transactions, and blocks are added to the previous block after validation and after undergoing a consensus decision to expose and resist tampering or manipulation of the data. There are many different blockchains used by many different virtual currencies. For example, Bitcoin in its native state exists on the Bitcoin blockchain, while Ether (or "ETH") exists in its native state on the Ethereum network. USDT (Tether) tokens are issued on various blockchains including, for example, the Ethereum network. Other distinct blockchains in existence with some examples of the most popular by total volume being Tron, Solana, Polygon, Binance Smart Chain, Arbitrum, Avalanche, Polygon, and Base.

23.     In cryptocurrencies, an <u>unspent transaction output (UTXO)</u>, represents a certain amount of cryptocurrency that has been authorized by a sender and is available to be spent by a recipient. The utilization of UTXOs in transaction processes is a key feature of many cryptocurrencies and was first invented for Bitcoin. Cryptocurrencies that utilize the UTXO model function differently compared to those using the <u>account model</u>. In the UTXO model, individual units of cryptocurrency, termed as unspent transaction outputs (UTXOs), are

---

4       Some cryptocurrencies operate on blockchains that are not public and operate in such a way as to obfuscate transactions, making it difficult to trace or attribute transactions.

transferred between users, analogous to the exchange of physical cash. This model impacts how transactions and ownership are recorded and verified within the blockchain network. In contrast, in the account model the blockchain preserves a record of each account and its corresponding balance for every block added to the network. This setup enables quicker balance verification without the need to scan historical blocks, but it increases the raw size of each block. In the UTXO model, each object is immutable: units of coins cannot be 'edited' in the same way an account balance is modified when a transaction occurs. Rather, the balance is computed from the transaction history dating back to when the coins were first minted. In valid blockchain transactions, only unspent outputs (UTXOs) are permissible for funding subsequent transactions. This requirement is critical to prevent double-spending and fraud. Accordingly, inputs in a transaction are removed from the UTXO set, while outputs create new UTXOs that are added to the set. The holders of private keys, such as those with cryptocurrency wallets, can utilize these UTXOs for future transactions. The UTXO model is crucial for tracking token ownership and facilitating cryptocurrency transactions. Unlike account-based systems, UTXOs allow each transaction's outputs to be redistributed within the network, resembling change received in a cash transaction.

24.    Co-spending in Bitcoin refers to the practice of using multiple addresses to fund a single transaction. Addresses which contribute to transactions with multiple inputs are sometimes called co-spent addresses. This is often done when the user's wallet does not have a large enough UTXO to fulfill the payment amount. In such cases, the wallet may choose to spend more than one input address in a transaction, which can be indicative of common input ownership. This heuristic is a key tool in blockchain forensics and ownership attribution, helping analysts trace

the ownership of assets across the blockchain (also called the co-spending heuristic, common-input-ownership heuristic, multi-input heuristic, or Nakamoto/Meiklejohn heuristic).

a.      The change in certain digital currency transactions is when the difference of value in a transaction is sent back to an address controlled by the original sender. This can be an already existing address or a new Bitcoin address that is created to receive the change. This is often handled automatically by wallet software being used. When the output of a transaction is used as the input of another transaction, it must be spent in its entirety. Bitcoin rules state that you can't use just a part of an input. For example, if someone wanted to send 1 Bitcoin and the only input they have to spend is from someone who previously sent them 1.5 Bitcoins, they will have to use all of this 1.5 Bitcoin as input and return the "change" (0.5 BTC) back to their wallet (minus any transaction/miner fees).

b.      Change address heuristics can also be used to "cluster" multiple addresses as belonging to a common entity (i.e. user/wallet). Change address detection heuristics utilize the characteristics of UTXOs. As it is difficult to send the exact specified amount of funds to the receiver, the remainder of the funds are to be returned to the entity via change address. Various heuristics are used to identify addresses under an individual user's control, such as common spending and one-time change address heuristics. These heuristics are employed by blockchain analysis tools and help in clustering addresses based on how wallets create transactions.

c.      A transaction hash, also called a transaction ID, is a unique string of characters which identifies a specific transaction on the blockchain—akin to a serial number or accounting journal entry number. A transaction hash is assigned to a

transaction when it is added to the blockchain, and it is generated by applying a hash function to the transaction details, including the sender's address, the receiver's address, and the amount of virtual currency being sent. Transaction hashes can be found on blockchain explorers and can be used to verify and track transactions.

d.    Although cryptocurrencies such as Bitcoin and Ether have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering and is an oft-used means of payment for illegal goods and services. By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track transactions.

e.    Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including on a tangible, external device ("hardware wallet"), downloaded on a PC or laptop ("desktop wallet"), with an Internet-based cloud storage provider ("online wallet"), as a mobile application on a smartphone or tablet ("mobile wallet"), printed public and private keys ("paper wallet"), and as an online account associated with a cryptocurrency exchange.  Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (e.g., smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can search the Internet.  Moreover, hardware wallets are located on some type of external or removable media device, such as a USB thumb drive or other commercially available device designed to store cryptocurrency (e.g. Trezor, Keepkey, or Nano Ledger).  In addition, paper wallets contain an address and a QR code[5] with the public and private key

---

5 A QR code is a matrix barcode that is a machine-readable optical label.

embedded in the code.  Paper wallet keys are not stored digitally.  Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words strung together in a phrase) or a complex password. Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase).  I also know that individuals possessing cryptocurrencies often have safeguards in place to ensure that their cryptocurrencies become further secured in the event that their assets become potentially vulnerable to seizure and/or unauthorized transfer.

    f.    Bitcoin "exchangers" and "exchanges" are individuals or companies that exchange bitcoin for other currencies, including U.S. dollars.  According to Department of Treasury, Financial Crimes Enforcement Network ("FinCEN") Guidance issued on March 18, 2013, virtual currency administrators and exchangers, including an individual exchanger operating as a business, are considered money services businesses.[6]  Such exchanges and exchangers are required to register with FinCEN and have proper state licenses (if required under applicable state law).  From my training and experience, I know that registered money transmitters are required by law to follow Bank Secrecy Act anti-money laundering ("AML") regulations, "Know Your Customer" ("KYC") protocols, and other verification procedures similar to those employed by traditional financial institutions. For example, FinCEN-registered cryptocurrency exchangers often require customers who want to open or maintain accounts on their exchange to provide their name, address, phone number, and the full bank account and routing numbers that

---

6 *See* "Application of FinCEN's Regulations to Person Administering, Exchanging, or Using Virtual Currencies," *available at* https://www.fincen.gov/resources/statutes-regulations/guidance/application-fincens-regulations-persons-administering.

the customer links to an exchange account.  As a result, there is significant market demand for illicit cryptocurrency-for-fiat currency exchangers, who lack AML or KYC protocols and often also advertise their ability to offer customers stealth and anonymity.  These illicit exchangers routinely exchange fiat currency for cryptocurrencies by meeting customers in person or by shipping cash through the mail.  Due to the illicit nature of these transactions and their customers' desire for anonymity, such exchangers are frequently able to charge a higher exchange fee, often as high as 9–10% (in contrast to registered and BSA-compliant exchangers, who may charge fees as low as 1–2%).

g.      Some companies offer cryptocurrency wallet services which allow users to download a digital wallet application onto their smart phone or other digital device.  A user typically accesses the wallet application by inputting a user-generated PIN code or password.  Users can store, receive, and transfer cryptocurrencies via the application; however, many of these companies do not store or otherwise have access to their users' funds or the private keys that are necessary to access users' wallet applications.  Rather, the private keys are stored on the device on which the wallet application is installed (or any digital or physical backup private key that the user creates).  As a result, these companies generally cannot assist in seizing or otherwise restraining their users' cryptocurrency.  Nevertheless, law enforcement could seize cryptocurrency from the user's wallet directly, such as by accessing the user's smart phone, accessing the wallet application, and transferring the cryptocurrency therein to a law enforcement-controlled wallet.  Alternatively, where law enforcement has obtained the recovery seed for a wallet (see above), law enforcement may be able to use the recovery seed phrase to recover or

reconstitute the wallet on a different digital device and subsequently transfer

cryptocurrencies held within the new wallet to a law enforcement-controlled wallet.

      h.    <u>Bitcoin ATMs/kiosks</u> are self-service kiosks that allow users to buy

Bitcoin and other cryptocurrencies using cash, credit, or debit cards. These machines

operate similarly to traditional ATMs but facilitate transactions directly with a Bitcoin

wallet, bypassing the need for a bank account. To use a Bitcoin ATM, you specify a

receiving address (typically via a quick response [QR] code), deposit traditional currency,

and the machine transfers the equivalent amount of Bitcoin to the specified wallet

address. Bitcoin ATMs may have higher transaction fees (typically ranging from 4% to

25% of the trade amount) compared to other transaction methods. Once money is sent

through these kiosks, the transfer often cannot be reversed. The global count of Bitcoin

ATMs is estimated to be over 38,000, with a large majority located in the United States.

North America holds the largest market share of Bitcoin ATMs globally at almost 90

percent. The current top operators of these kiosks in the USA include Bitcoin Depot,

CoinFlip, Athena Bitcoin, RockItCoin, and Bitstop. The FBI and FinCEN have reported

significant losses due to Bitcoin ATM scams, with estimates indicating over $333 million

in reported losses in 2025 alone. The FBI's Internet Crime Complaint Center (IC3) has

received over 12,000 complaints related to these scams, highlighting the ongoing issue

with Bitcoin ATM fraud.[7]

### KRAKEN

25.    Kraken (legally named Payward Interactive, Inc.) is a US-based cryptocurrency

exchange founded in 2011. Beyond cryptocurrencies, in most US states the exchange facilitates

---

[7] See "FBI: Over $333 Million Reported Stolen by Scammers Through Crypto Kiosks" *available at* https://www.aarp.org/money/scams-fraud/fbi-crypto-atm-scam-report/

the trading of stocks, futures, and ETFs. Kraken was the first cryptocurrency company to obtain

a bank charter. In 2025 it began allowing the trading of tokenized equities by non-US customers.

26.    In 2025 it had $207 billion in quarterly trading volume and was ranked as the

world's fourteenth-largest crypto exchange.

## BLOCKCHAIN ANALYSIS AND CHAINALYSIS

27.    Through <u>blockchain analysis</u>, law enforcement can trace transactions on

blockchains to determine which virtual currency addresses are sending and receiving particular

virtual currency. This analysis can be invaluable to criminal investigations for many reasons,

including that it may enable law enforcement to uncover transactions involving illicit funds and

to identify the person(s) behind those transactions. To conduct blockchain analysis, law

enforcement officers use reputable, free open-source blockchain explorers, as well as

commercial tools and services. These commercial tools are offered by different blockchain-

analysis companies. Through numerous unrelated investigations, law enforcement has found the

information associated with these tools to be reliable.

28.    The information contained herein is based, in part, on blockchain analysis using

the commercial blockchain analysis tools Chainalysis and TRM Labs. Commercial blockchain

analysis tools supplement open source blockchain data by applying heuristics or manual

investigations to enhance the process of blockchain analysis. A cluster (or grouping of addresses)

in these tools is a collection of addresses where the tool vender assesses one entity controls them.

29.    Chainalysis and TRM Labs are leading providers of blockchain analysis tools

used by law enforcement and businesses. Both companies offer various products that help

organizations understand cryptocurrency movements, assess risks, and comply with regulations.

Chainalysis and TRM Labs have been instrumental in solving high-profile cybercrime cases by

16

helping authorities trace stolen funds back to criminals. The process involves using sophisticated algorithms and data visualization tools to map out transaction patterns on the blockchain. As cryptocurrencies continue to grow in popularity, the demand for blockchain analysis tools and services are expected to increase, enhancing the ability to monitor financial activities.

## FACTS SUPPORTING PROBABLE CAUSE

### Investigation Background

30.    This affidavit sets forth probable cause to support the seizure of the SUBJECT ASSETS.

31.    On November 18, 2024, a resident of Hampton, New Hampshire (VICTIM 1), reported to the Hampton Police Department (HPD) that on November 14, 2024, she received a fraudulent email receipt which she believed to be legitimate at the time. The email receipt purported to be from the online payment system known as PayPal. The receipt portrayed that VICTIM 1 had an unauthorized $297.87 purchase on her account. The fraudulent receipt advised VICTIM 1 to call (860) 451-9914 to contact customer support to cancel the order.

32.    VICTIM 1 called the above referenced phone number and the subject who answered the phone told VICTIM 1 that she "must have been hacked" and they would transfer her to the "FTC." Once transferred to the fraudulent FTC "Agent," the individual (scammer) convinced VICTIM 1 that a refund had been issued to her, but that she was accidentally refunded $25,000 in error, and that she would need to withdraw the $25,000 in cash from her bank and send it back to him via Bitcoin (BTC).

33.    VICTIM 1 proceeded to her bank but was only able to withdraw $20,000 in cash. The scammer directed VICTIM 1 to bring the $20,000 cash to a nearby Bitcoin Depot ATM/kiosk and provided her with instructions throughout the process leading to her ultimately

depositing the $20,000 cash into the Bitcoin Depot ATM/kiosk. The funds were deposited into a Bitcoin wallet address of: bc1q7s29as8rwfnusevdm7d47rd3x2mkr3xvu0afn2.

34.     As relevant here, the cryptocurrency transfer included 0.15978934 Bitcoin (BTC), which was then worth $14,334. The remainder of the $20,000 deposited by VICTIM 1 (approximately $5,666) was removed prior to the purchase of BTC as transaction fees charged by Bitcoin Depot.

35.     HPD worked with the New England State Police Information Network (NESPIN) and the USSS Manchester Resident Office (MCH) to trace the stolen cryptocurrency.

36.     In brief, NESPIN traced the stolen funds utilizing Chainalysis. USSS Network Intrusion Forensic Analyst Peter LaRoche (NIFA LAROCHE) duplicated the tracing conducted by NESPIN utilizing TRM Labs and concurred with the results. VICTIM 1's stolen Bitcoin was routed through multiple addresses in the two months after the fraud (between November 20, 2024, and January 3, 2025).  On January 24, 2026, unspent transaction outputs (UTXOs) from 24 unique Bitcoin addresses combined to transfer a total of 1.00235383 BTC valued at approximately $89,501 at the time of the transaction (transaction ID: 80fbb3bb75da09c21c7489470659da13b1fa7b4ec11f0b0a3295c36b5e02ce65), to an address attributed to the cryptocurrency exchange Kraken, 3KccWCogAXXCrx5JMmr3vnxvQGtD6yZjP9 (the SUBJECT ADDRESS). Included in these UTXOs were the funds directly attributed to the fraudulent transaction made by VICTIM 1 on November 20, 2024. The following graph shows the trace of VICTIM 1's stolen BTC.



37.     In my training and experience, the frequent movement of the stolen funds through multiple cryptocurrency addresses/wallets is emblematic of concealment money laundering, as is holding funds in these various wallets for extended periods of time. These transaction patterns are designed to make it harder for law enforcement to trace and recover funds.

38.     On February 6, 2026, Detective Derek Brown (DET. BROWN) of the Hampton Police Department sent a search warrant granted by Judge Mark E. Howard of the Rockingham County Superior Court to Kraken requesting information on the account associated with the SUBJECT ADDRESS at Kraken and transaction hash 80fbb3bb75da09c21c7489470659da13b1fa7b4ec11f0b0a3295c36b5e02ce65.

39.     On February 10, 2026, DET. BROWN received a response from Kraken indicating indicate that the SUBJECT ADDRESS was associated with account ID AA14 N84G BTOB VODI (the SUBJECT ACCOUNT), belonging to Romanian citizen Silviu-Valentin Miroslav. A Romanian picture ID for MIRSOLAV was included in the returned package.

19

MIRSOLAV was the user of phone number +40766523777 and email address of

silviu.miroslav@gmail.com. The financial records associated with the account were forwarded to

NESPIN for review. NESPIN reviewed the records and notified DET. BROWN that the reported

current balance in the account was 0.8645930572 BTC with 0.13995132 BTC (the SUBJECT

ASSETS) of the balance attributable to VICTIM 1.

40.    On February 11, 2026, DET. BROWN applied for and obtained a state search

warrant to request a 14-day freeze from Kraken.  An additional search warrant was also issued at

the time of the freeze request to confirm the balance of the SUBJECT ACCOUNT. A response

from Kraken verified the SUBJECT ACCOUNT containing the SUBJECT ASSETS was frozen

and that the total balance of the account was 0.8645930572 BTC. Additionally, there was

approximately 3,500.0067 Euros on balance in the account.

41.    I am seeking this warrant to seize the 0.13995132 BTC (the SUBJECT ASSETS)

for the purpose of initiating a federal civil forfeiture action to return the SUBJECT ASSETS to

VICTIM 1.

## CONCLUSION

42.    In summary, based on information derived from the foregoing investigation, there

is probable cause to conclude that the SUBJECT ASSETS are subject to forfeiture to the United

States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1) because they are property involved

in, or traceable to, money laundering and money laundering conspiracy in violation of 18 U.S.C.

§§ 1956 and/or 1957; pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) because they

constitute or are derived from proceeds traceable to wire fraud and wire fraud conspiracy in

violation of 18 U.S.C. §§ 1343 and/or 1349; and pursuant to 18 U.S.C. § 982(a)(2)(A) because

they constitute or are derived from proceeds obtained as the result of wire fraud and wire fraud conspiracy affecting a financial institution in violation of 18 U.S.C. §§ 1343 and/or 1349.

43.     I submit that this affidavit supports probable cause for a combined criminal and civil seizure warrant authorizing the seizure of the SUBJECT ASSETS.

44.     Because the warrant will be served to Kraken via the online Kodex Law Enforcement Portal, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

/s/ Nathanael Gamble
Nathanael Gamble
Special Agent
United States Secret Service

Subscribed and sworn to telephonically on February 25, 2026

UNITED STATES MAGISTRATE JUDGE

21

**Attachment A**

**Description of Property to be Searched**

The location to be searched is user account ID AA14 N84G BTOB VODI, registered to Silviu-Valentin Miroslav of Romania, with a user ID of *silviusbz*, stored in or accessible at Payward Interactive, Inc. (d.b.a. Kraken) located at 106 E. Lincoln Way, 4th Floor, Cheyenne, Wyoming.

This warrant will be executed by serving the warrant on Payward Interactive Inc., which will then transfer the property detailed in Attachment B to USSS law enforcement cryptocurrency wallet address 34UaYT2JY7NZ1yhwrfuaZG82sjPsnSJ5K4 at Coinbase.

## **Attachment B**

## **Description of Items to be Seized**

The item(s) to be seized are 0.13995132 Bitcoin (BTC).